**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| SIENA CAPITAL, LLC | ) | CASE NO. 1:22-cv-772 |
| d/b/a OXFORD FINANCIAL PARTNERS | ) | |
| 8044 Montgomery Road, Suite 163 | ) | |
| Cincinnati, Ohio 45236 | ) | JUDGE |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | **VERIFIED COMPLAINT FOR** |
| TYLER HENDERSON | ) | **TEMPORARY RESTRAINING** |
| 913 Monmouth Street, Unit 2B | ) | **ORDER AND PRELIMINARY** |
| Newport, Kentucky 41071 | ) | **INJUNCTION** |
| | ) | |
| | ) | |
| MONTEREY WEALTH PARTNERS, LLC | ) | |
| d/b/a MONTEREY WEALTH | ) | |
| c/o Jay Cohen | ) | |
| 200 Ashford Center North, Suite 310 | ) | |
| Atlanta, Georgia 30338 | ) | |
| | ) | |
| Defendants. | ) | |

## THE PARTIES

1. Plaintiff Siena Capital, LLC, d/b/a Oxford Financial Partners ("Plaintiff" or "Oxford") is a Registered Investment Advisor and an Ohio limited liability company maintaining its principal place of business at the address listed in the caption of this Complaint. Oxford is a citizen of the State of Ohio.

2. Oxford is registered with the U.S. Securities and Exchange Commission (the "SEC"), and is engaged in the business of financial planning and asset management for affluent individuals, families and trusts, for which clients are charged a fee calculated on a percentage of the client's assets under management ("AUM") overseen by the firm.

3.     Defendant Tyler Henderson ("Henderson") is an Investment Advisor Representative who, from February 1, 2018, through December 19, 2022, was registered with Oxford, first as an employee and later as an independent contractor.

4.     Henderson resides at the address listed in the caption of this Complaint. Henderson is a citizen and domiciliary of the Commonwealth of Kentucky.

5.     On February 1, 2018, Henderson executed an employment agreement with Oxford containing numerous restrictive covenants (the "Employment Agreement"). A true and correct copy of the Employment Agreement is attached hereto as Exhibit A.

6.     On February 1, 2019, Henderson executed a Financial Advisor Independent Contractor Agreement with Oxford containing numerous restrictive covenants (the "Independent Contractor Agreement"). A true and correct copy of the Independent Contractor Agreement is attached hereto as Exhibit B.

7.     Defendant Monterey Wealth Partners, LLC d/b/a Monterey Wealth ("Monterey") is a Registered Investment Advisor and a Georgia limited liability company maintaining its principal place at the address listed in the caption of this Complaint. Monterey is a resident of the State of Georgia.

8.     Monterey has been registered with the SEC since May 2020.

9.     On November 8, 2022, Monterey registered with the State of Ohio in order to be able to conduct securities advisory business within the state. Until its 2022 registration with the State of Ohio, Monterey had only registered with the State of Georgia.

10.    Oxford seeks immediate injunctive relief against Henderson and Monterey (collectively, "Defendants") pursuant to Rule 65 of the Federal Rules of Civil Procedure.

## JURISDICTION AND VENUE

11. This Court possesses subject matter jurisdiction over Oxford's claims pursuant to 28 U.S.C. § 1332 as the parties are diverse and the amount in controversy exceeds $75,000 exclusive of interest and costs.

12. This Court possesses personal jurisdiction over Henderson because Oxford's claims arise from Henderson availing himself of the privilege of transacting business in Ohio and causing tortious injury to Oxford in Ohio.

13. This Court possesses personal jurisdiction over Monterey because Oxford's claims arise from Monterey availing itself of the privilege of transacting business in Ohio and causing tortious injury to Oxford in Ohio.

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Loc.R. 82.1(e) because a substantial part of the events giving rise to Oxford's claims occurred in this District.

15. In the Employment Agreement, Henderson consented "to jurisdiction in Ohio state and federal courts for any proceeding to enforce or interpret this Agreement" and that "venue for any action or proceeding shall be exclusively in Hamilton County, Ohio." Ex. A, § 6.3.

16. In the Independent Contractor Agreement, Henderson agreed that "Any legal action or proceeding with respect to this Agreement shall be brought and maintained in Hamilton County, Ohio." Ex. B, § 11.10.

## FACTS

17. On February 1, 2018, Henderson commenced his employment with Oxford as an Investment Advisor Representative.

18. In connection with Henderson's employment, Henderson executed the Employment Agreement attached as Exhibit A.

3

19. In accepting employment with Oxford, Henderson agreed to bring certain of his pre-existing clients with him from his prior firm, MML Investor Services, LLC ("Mass Mutual") to Oxford (the "Legacy Clients"). Henderson agreed that, in return for Oxford employing him, ownership of the Legacy Clients would transfer to Oxford such that Henderson would no longer have any claim of ownership over the Legacy Clients.

20. Not only did Henderson agree to transfer the ownership of the Legacy Clients to Oxford, but Henderson also received significant financial compensation for the transfer of the Legacy Clients. In addition to Henderson's base salary and benefits, Oxford paid Henderson a bonus equal to 40% of the 12-month trailing revenue Oxford earned on the Legacy Clients in the first year of Henderson's employment with Oxford.

21. The Employment Agreement set forth various material terms relevant to the instant case, such as duties relating to non-solicitation:

> **2.1 Covenants.** Employee covenants and agrees that for the Restriction Period (defined in Section 2.1.1 Employee shall not, directly or indirectly:
>
>> a) For the benefit of Employee or any other person or enterprise, (i) solicit any business whatsoever from any customer or client of the Company, (ii) induce or cause any customer or client of the Company at the time of Employee's separation from the Company to cease purchasing any service or product from the Company or to terminate or change such customer's or client's business relationship with the Company in any manner, or (iii) induce or cause any supplier to cease providing or selling any service or product to the Company or to terminate or change such supplier's business relationship with the Company in any manner.
>
> \*\*\*
>
> **2.1.2 Indirect Activities.** Employee shall be deemed to be indirectly engaged in a business covered by Section 2.1.1(i, ii, or iii) if Employee (1) owns an interest in or participates in the management, operation, or control of any enterprise that is engaged in a business covered by Section 2.1.1(i, ii, or iii) or (2) performs financial

4

planning or asset management for any enterprise that is engaged in a business covered by Section 2.1.1(i, ii, or iii). For purposes of this Agreement, the term enterprise includes a sole proprietorship, partnership, limited liability company, corporation, trust, association, or other form of entity or association.

**2.1.3 Reasonableness of Restrictions.** Employee acknowledges that the covenants set forth in this Section 2.1 do not impose unreasonable restrictions or work a hardship on Employee, are essential to the willingness of the Company to employ Employee, are necessary and fundamental to the protection of the business conducted by the Company, and are reasonable as to scope, duration, and territory.

**2.1.4 Restriction Period.** The covenants set forth in this Section 2.1 shall be binding on Employee for the period (the 'Restriction Period') commencing on the date of this Agreement and ending five (5) years after the date that Employee's employment with the Company terminates for any reason.

Ex. A, §§ 2.1.1–2.1.4.

22. The Employment Agreement also set forth duties relating to confidentiality:

**2.2 Confidentiality.** As used in this Agreement, the 'Confidential Information' shall mean (a) any information that relates to the business, products, technology, customers, finances, plans, proposals, or practices of the Company, including, but not limited to, plans and specifications for new products, research and development, inventions, marketing strategies, lists of the Company's clients, customers, markets and suppliers, nonpublic financial information, budgets, and projections; (b) any other information that the Company designates as 'confidential'; and (c) any information given to the Company by a customer or supplier or otherwise designated as being confidential by a customer or supplier. The Confidential Information shall include information in any form in which such information exists, whether oral, written, film, tape, computer disk, or other form of media. The Confidential Information shall exclude any information that is or becomes part of the public domain. The Confidential Information shall be the sole and exclusive property of the Company, shall be considered trade secrets of the Company, and shall be entitled to all protections provided by applicable law to trade secrets. Except with the prior written consent of the Company, Employee agrees during the term of this Agreement and at all times after the termination of employment with the Company (a) to hold the Confidential Information in the strictest confidence; (b) to not disclose the

Confidential Information to any person or enterprise (except to other employees of the Company on a 'need-to-know' basis to the extent necessary for them to perform the duties of their employment with the Company); and (c) to exercise the highest degree of care in safeguarding Confidential Information against loss, theft, or other inadvertent disclosure. During the term of this Agreement and at all times after the termination of employment with the Company, Employee agrees not to use the Confidential Information in any manner except in connection with the performance of Employee's duties of employment with the Company or except with the prior written consent of the Company.

**2.3 Return of Documents.** Employee agrees that all originals and copies of records, data, reports, documents, lists, plans, drawings, correspondence, memoranda, notes, and other materials related to or containing any Confidential Information, in whatever form they exist, whether written, film, tape, computer disk, or other form of media, shall be the sole and exclusive property of the Company and shall be returned promptly to the Company on the termination of employment with the Company or on the written request of the Company.

Ex. A, §§ 2.2–2.3.

23. In the Employment Agreement, Henderson agreed that, for violations of Sections 2.1, 2.2, 2.3, 2.4, or 2.5 of the Employment Agreement, Oxford would "be entitled, in addition to all other remedies it may have at law or in equity, to a restraining order, temporary and permanent injunctive relief, specific performance, or other appropriate equitable relief, without showing or proving that any actual damage has been sustained … ." Ex. A, § 2.6.

24. In the Employment Agreement, Henderson further agreed that, for violations of Sections 2.1, 2.2, 2.3, 2.4, or 2.5 of the Employment Agreement, Oxford "shall be entitled to liquidated damages for each affected client equal to three times the annual or annualized fees, commissions or other revenue earned from each of the affected clients…" Ex. A, § 2.7.

25. In the Employment Agreement, Henderson also agreed that the termination of his employment with Oxford would not release him from the obligations set forth in Section 2 of the Employment Agreement. Ex. A, § 2.8.

6

26. In late 2018, Henderson and Oxford agreed that Henderson would transition from serving Oxford as a W-2 employee to serving Oxford as an independent contractor.

27. On February 1, 2019, Henderson executed the Independent Contractor Agreement.

28. In the Independent Contractor Agreement, Henderson reaffirmed his acknowledgement that ownership of the Legacy Clients "was transferred to [Oxford] under the terms of an employment agreement and Exhibit A dated February 1, 2018." Ex. B, § 6.1. Henderson further acknowledged "that all covenants of non-solicitation from the February 1, 2018 employment agreement remain fully in force." *Id.*

29. The Independent Contractor Agreement did not supersede or vitiate any obligations set forth in the Employment Agreement. Instead, the Independent Contractor Agreement and the Employment Agreement are to be read in conjunction with one another.

30. Like the Employment Agreement, the Independent Contractor Agreement set forth various material terms relevant to the instant case, such as duties relating to the protection of Oxford's confidential information:

**7. Protection of Confidential Information.**

**7.1. Definitions.** For purposes of this Agreement, 'Confidential Information' includes, but is not limited to, all information not generally known to the public, in spoken, printed, electronic, or any other form or medium, relating directly or indirectly to: plans and specifications for new products; research and development; inventions; marketing strategies; lists of the Company's clients, customers, markets, and suppliers; nonpublic financial information; budgets; and projections. Contractor understands this list is not exhaustive, and that Confidential Information also includes other information that is marked or otherwise identified as confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used.

**7.2 Disclosure and Use Restrictions.** Contractor agrees and covenants: (a) to treat all Confidential Information as strictly confidential; (b) not to directly or indirectly disclose, publish,

communicate, or make available Confidential Information, or allow it to be disclosed, published, communicated, or made available, in whole or part, to any entity or person whatsoever (including other Contractors of the Company not having a need to know and authority to know and use the Confidential Information in connection with the business of the Company and, in any event, not to anyone outside of the direct employ of the Company except as required in the performance of Contractor's authorized contractual duties to the Company; and (c) not to access or use any Confidential Information, and not to copy any documents, records, files, media, or other resources containing any Confidential Information, or remove any such documents, records, files, media, or other resources from the premises or control of the Company, except as required in the performance of Contractor's authorized contractual duties to the Company.

**7.3. Commencement of Obligation.** Contractor understands and acknowledges that its obligation under this Agreement with regard to any particular Confidential Information shall commence immediately upon Contractor first having access to such Confidential Information (whether before or after the effective date of this Agreement) and shall continue … after its termination until such time as any individual article of Confidential Information becomes public knowledge other than as a result of Contractor's breach of this Agreement or breach by those acting in concert with Contractor or on Contractor's behalf.

Ex. B, §§ 7.1–7.3.

31. The Independent Contractor Agreement also set forth duties relating to non-solicitation:

**9.1. Covenant to Not Solicit Clients.** Contractor agrees to not directly or indirectly solicit business from any client or client accounts serviced or held by the Company or any other independent contractor affiliated with the Company. This covenant to not solicit clients survives termination of this Agreement for a period of five (5) years from the date of termination.

**9.2. Covenant to Not Accept Clients.** Contractor agrees to not accept the business of any clients or client accounts serviced or held by the Company or any other independent contractor affiliated with the Company. This covenant to not accept the business of certain clients or client accounts survives the termination of this Agreement for a period of five (5) years from the date of termination.

\*\*\*

**9.5 Reasonableness of Restrictions.** Contractor acknowledges that the covenants set forth in this § 9 do not impose unreasonable restrictions or create a hardship for Contractor, are essential to the willingness of the Company to enter into this Agreement with Contractor, are necessary and fundamental to the protection of the business conducted by the Company, and are reasonable as to scope, duration, and territory.

Ex. B, §§ 9.1–9.2, § 9.5.

32. In the Independent Contractor Agreement, Henderson and Oxford agreed that Henderson would not be liable to Oxford for damages associated with Henderson breaching the provisions set forth in Section 9 of the Independent Contractor Agreement if Henderson paid Oxford a transfer fee equal to 3 times Oxford's 12-month trailing revenue from the client or client account calculated as of the date Oxford last serviced such client (the "Transfer Fee"). Ex. B, § 9.4. The provision by its terms is not a liquidated damages clause, but rather is a mechanism for Oxford to be partially compensated for Henderson's breaches of his restrictive covenants, while avoiding the costs and distractions of litigation.

33. In the Independent Contractor Agreement, Henderson acknowledged that Oxford will be entitled to preliminary and permanent injunctive relief, in addition to any other legal remedies that may be available to Oxford for breaches of §§ 9.1, 9.2, and 9.3 of the Independent Contractor Agreement. Ex. B, § 10.

34. Through August and September 2022, Oxford was in negotiations with Buckingham Strategic Wealth, LLC, a prestigious investment advisory firm based in St. Louis, Missouri ("Buckingham"), about the possibility of Oxford being acquired by Buckingham (the "Buckingham Deal").

35. While negotiations about the Buckingham Deal were ongoing, Oxford—trusting that Henderson would safeguard Oxford's confidential business information, as required by §

9

2 of the Employment Agreement and § 7 of the Independent Contractor Agreement—permitted Henderson access to confidential information about how Buckingham would serve clients following the Buckingham Deal by attending multiple meetings relating to the same.

36. In October 2022, Henderson attended a virtual meeting on Zoom with Oxford's managing partner, Erik Christman, and a representative of Buckingham (the "Zoom Meeting").

37. During the Zoom Meeting, Buckingham offered, in connection with the Buckingham Deal, to hire Henderson as a W-2 employee. Buckingham's offer of employment to Henderson included comprehensive benefits, meaningful bonuses, and the potential for awards of stock in Buckingham.

38. Despite that Oxford entrusted Henderson with confidential information about the Buckingham Deal, Henderson never indicated that he was not going to join Buckingham.

39. The Buckingham Deal was due to close on or about February 1, 2023.

40. The Buckingham Deal was contingent upon Oxford maintaining its book of business and the levels of revenue it generates, until the Buckingham Deal closed.

41. On December 15, 2022, Henderson abruptly and without advance notice resigned from Oxford effective immediately.

42. On December 16, 2022, Henderson re-registered as an Investment Advisor Representative associated with Monterey in a newly-created "branch office" located in Moscow, Ohio.

43. Monterey's public website does not mention that an Ohio office exists, let alone an address for any such location in Moscow, Ohio.

44. Upon information and belief, the "branch office" Henderson has identified is actually his parents' home, as Henderson's parents reside in Moscow, Ohio.

45. Upon resigning from Oxford, Henderson has retained and failed to return to Oxford information and documents deemed "confidential" under § 2.2 of the Employment Agreement and § 7 of the Independent Contractor Agreement (the "Confidential Information"), including without limitation Confidential Information regarding the Legacy Clients.

46. Oxford never agreed to permit Henderson to retain or use Oxford's Confidential Information.

47. By retaining and failing to return Oxford's Confidential Information, Henderson has violated and continues to violate the Employment Agreement, which requires that such Confidential Information "be returned promptly to [Oxford] on the termination of employment with [Oxford] or on the written request of [Oxford]." Ex. A, § 2.2.

48. Immediately following Henderson's resignation, Oxford received numerous requests from Legacy Clients formerly serviced by Henderson to transfer their securities accounts to Monterey. It would not have been possible for all of these Legacy Clients to immediately direct Oxford to transfer their accounts to Monterey *en masse* absent Henderson and/or Monterey soliciting the Legacy Clients in advance of Henderson's tendering his resignation from Oxford.

49. It would also not have been possible for all of these Legacy Clients to immediately direct Oxford to transfer their accounts to Monterey *en masse* absent Henderson wrongfully retaining and using Oxford's Confidential Information to solicit the Legacy Clients in advance of Henderson's tendering his resignation from Oxford.

50. By using Oxford's Confidential Information to solicit the Legacy Clients and to otherwise benefit Monterey, Henderson has violated and continues to violate his duties of

confidentiality under § 2.2 of the Employment Agreement and § 7.2 of the Independent Contractor Agreement.

51. Had Monterey not agreed to permit Henderson to register with Monterey's firm, Henderson would not have been able to provide professional financial advisory services to more than 5 clients for compensation under the *de minimis* exemption from registration pursuant to the Ohio Securities Act. *See* R.C. 1707.141.

52. To date, all but a handful of the Legacy Clients have terminated their relationship with Oxford and have transferred management of the securities brokerage accounts to Monterey. This includes approximately 20 clients, approximately $20.3 million in AUM and trailing 12-month revenue of approximately $185,000.00.

53. To date, Oxford has suffered damages in excess of $2 million.

54. On December 16, 2022, Oxford's counsel sent a letter to Henderson's counsel demanding that Henderson comply with his contractual obligations and enclosed a duplicate copy of Henderson's Independent Contractor Agreement (the "Cease and Desist"). A true and accurate copy of the Cease and Desist is attached hereto as Exhibit C.

55. Oxford's counsel also provided Monterey with a copy of the Cease and Desist.

56. Despite receiving a copy of the Cease and Desist, Monterey has accepted, and continues to accept, the business of the Legacy Clients under circumstances that violate Henderson's contractual obligations under the Independent Contractor Agreement.

57. On December 19, 2022, Henderson's counsel informed Oxford's counsel that Henderson intended to transfer "his book of business to his new firm" despite the bright-line obligations set forth in Henderson's Employment Agreement and Independent Contractor

Agreement (the "12.19 Response Letter"). A true and correct copy of the 12.19 Response Letter is attached hereto as Exhibit D.

58. On December 23, 2022, Oxford's counsel sent a litigation hold notice to Henderson's counsel.

59. On December 28, 2022, Oxford's counsel received from Henderson's counsel a response to the litigation hold notice (the "12.28 Response Letter"). A true and correct copy of the 12.28 Response Letter is attached hereto as Exhibit E.

60. In the 12.28 Response Letter, Henderson's counsel again claimed that "the fact that Mr. Henderson moved his book of business from [Oxford] to Monterey Wealth Partners … provides no basis for [Oxford] to bring legal action against Mr. Henderson, since the agreement at issue expressly authorized him to do just that." Ex. E.

61. Despite the claims made by Henderson's counsel in the 12.19 Response Letter and the 12.28 Response Letter, the Legacy Clients are *not* part of Henderson's book of business because, as Henderson is acutely aware, Henderson (a) transferred ownership of the Legacy Clients to Oxford in 2018 when he signed the Employment Agreement, (b) received substantial financial consideration for transferring the Legacy Clients to Oxford in connection with the Employment Agreement, and (c) expressly acknowledged that he would have no claim to ownership of the Legacy Clients in 2019 upon separation from Oxford when he signed the Independent Contractor Agreement.

62. Through the conduct described above, Defendants have delayed the Buckingham Deal and substantially reduced the valuation that Oxford will receive through the Buckingham Deal.

63. If Henderson and Monterey are able to continue freely soliciting Oxford clients and profit from doing so, Oxford will suffer irreparable injury. Not only are Henderson and Monterey destroying Oxford's goodwill with its clients, but their conduct has put in jeopardy Oxford's contemplated transaction with Buckingham, which would afford Oxford many new opportunities and resources to forward its business through joint marketing, financial support and all the synergies that come with two businesses in the same industry aligning and joining forces. If the Buckingham Deal fails because of Henderson's conduct, the losses will be unique and incalculable. Moreover, if Henderson's conduct is not immediately enjoined, other Investment Advisor Representatives associated with Oxford may be emboldened also to solicit clients that are subject to a restrictive covenant if they resign from the firm, further imperiling Oxford's operations as a going concern and irreparably damaging its reputation and goodwill with its clients and in the community.

64. The conduct of Henderson and Monterey was and is in furtherance of a scheme to obtain and convert to Henderson's personal use and gain the Oxford clients Henderson serviced and whose right to service the accounts belongs exclusively to Oxford, all for the benefit of Henderson and Monterey, Henderson's new employer.

65. Oxford believes and therefore avers that:

    a. Henderson has possession or control of extensive confidential and proprietary Oxford customer information, including lists of Oxford customer accounts and/or account information for customers Henderson serviced while at Oxford;

    b. Henderson has provided Oxford's confidential and proprietary information regarding its clients to Monterey to facilitate and expedite Monterey's role in processing the transfer of the management of the Legacy Clients' securities brokerage accounts from Oxford to Monterey;

    c. Monterey, with Henderson's knowledge and experience, has and will continue to use Henderson to solicit Oxford accounts and to divert the business of Oxford customers from Oxford to Monterey; and

14

    d.   Henderson will otherwise continue to engage in acts constituting a breach of the terms of the Employment Agreement and the Independent Contractor Agreement; a breach of his duty of loyalty to Oxford; and other tortious conduct.

66. By virtue of the foregoing, Oxford has demonstrated likelihood of success on the merits and that a balancing of the equities favors the issuance of an injunction against Henderson and Monterey.

67. As a result of Defendants' actions, Oxford stands to lose clients, prospective clients, referral sources, business expectancies, goodwill, competitive advantage, and revenues in an amount that cannot be readily ascertained. In the investment advisory industry, client relationships are paramount and can often extend through multiple generations. Therefore, the great financial value of an unimpeded client relationship in the industry cannot be truly measured.

68. If Henderson is not immediately stopped from interfering with Oxford's relationships and contracts with Oxford's clients, and from otherwise violating his legal obligations to Oxford, including, without limitation, Henderson's obligations under the Employment Agreement and the Independent Contractor Agreement, Oxford will continue to suffer substantial and irreparable harm.

69. If Monterey is not immediately stopped from accepting business from the Legacy Clients whose accounts Henderson wrongly diverted to Monterey, and from encouraging and facilitating breaches of Henderson's obligations under the Employment Agreement and the Independent Contractor Agreement, Oxford will continue to suffer substantial and irreparable harm.

70. Notwithstanding the damages to which Oxford is entitled under the Employment Agreement and the Independent Contractor Agreement and applicable law, Oxford lacks an

adequate remedy at law to address the substantial and irreparable harm that it is suffering as a result of Defendants' continuing and future wrongful actions.

**COUNT I**
**BREACH OF CONTRACT**
**(Against Henderson)**

71. Oxford incorporates by reference the foregoing paragraphs as if fully rewritten here.

72. The Employment Agreement and the Independent Contractor Agreement are valid and binding contracts.

73. Henderson has violated and continues to violate the Employment Agreement and Independent Contractor Agreement, both of which Henderson agreed to abide by in writing.

74. Oxford has suffered, and continues to suffer, significant damages as a direct and proximate result of Henderson's conduct.

75. As a result of Henderson's various breaches, Oxford is entitled to at least the express remedies set forth in § 2.6, § 2.7, and § 6.4 of the Employment Agreement and § 10 and § 11.11 of the Independent Contractor Agreement, including, without limitation, injunctive relief to prevent Henderson's threatened or continuing breaches, monetary compensation for the value of the client business relationships, and Oxford's costs, including attorneys' fees.

76. In addition, due to Henderson's ongoing violations of the Employment Agreement and Independent Contractor Agreement, and the difficulty in ascertaining potentially lost goodwill and/or business, there is a significant and imminent risk that Oxford will continue to suffer irreparable injury for which there is no adequate remedy at law.

77. Moreover, in addition to monetary damages, Oxford is entitled to damages arising out of Henderson's wrongful solicitation of the Legacy Clients, as well as preliminary and

permanent injunctive relief against further breaches of the Employment Agreement and the Independent Contractor Agreement.

### COUNT II
### TORTIOUS INTERFERENCE
### WITH BUSINESS RELATIONS
### (Against Henderson)

78. Oxford incorporates by reference the foregoing paragraphs as if fully rewritten here.

79. A business relationship existed between Oxford and the Legacy Clients.

80. Henderson knew that a business relationship existed between Oxford and the Legacy Clients.

81. Without any privilege or justification to do so, Henderson intentionally and improperly acted to terminate the business relationship existing between Oxford and the Legacy Clients.

82. Oxford has suffered, and continues to suffer, significant damages as a direct and proximate result of Henderson's conduct.

83. Due to the difficulty in ascertaining potentially lost goodwill and/or business, there is a significant and imminent risk that Oxford will continue to suffer irreparable injury for which there is no adequate remedy at law.

84. Oxford is entitled to damages arising out of Henderson's wrongful solicitation of the Legacy Clients, as well as preliminary and permanent injunctive relief against further breaches of the Employment Agreement and the Independent Contractor Agreement.

<u>**COUNT III**</u>
**TORTIOUS INTERFERENCE**
**WITH CONTRACT**
**(Against Monterey)**

85. Oxford incorporates by reference the foregoing paragraphs as if fully rewritten here.

86. Without any privilege or justification to do so, Monterey acted in concert with Henderson and used Henderson to solicit the accounts of the Legacy Clients away from Oxford for Monterey's financial benefit.

87. When Monterey used Henderson to improperly solicit the Legacy Clients away from Oxford for Monterey's financial benefit, Monterey knew or had reason to know that the Employment Agreement and Independent Contractor Agreement existed and barred Henderson from soliciting or accepting the business of Oxford's accounts.

88. Oxford has suffered, and continues to suffer, significant damages as a direct and proximate result of Monterey's conduct.

89. Due to the threat of future violations of the Employment Agreement and the Independent Contractor Agreement as well as the difficulty in ascertaining potentially lost goodwill and/or business, there is a significant and imminent risk that Oxford will continue to suffer irreparable injury for which there is no adequate remedy at law.

90. Oxford is entitled to damages arising out of Monterey's wrongful conduct in encouraging and facilitating  Henderson's breach of his contractual duties, as well as preliminary and permanent injunctive relief against further breaches of the Employment Agreement and the Independent Contractor Agreement.

**WHEREFORE**, Oxford  respectfully requests that this Court enter a judgment in its favor and enter an order:

i.      Enjoining Henderson and any person or entity acting in concert with Henderson from contacting, communicating with, or servicing in any manner the Legacy Clients Henderson caused to transfer from Oxford to Monterey in violation of the Employment and Independent Contractor Agreements;

ii.     Enjoining Henderson and any person or entity acting in concert with Henderson from further violations of the Employment Agreement and Independent Contractor Agreement;

iii.    Enjoining Monterey and any person or entity acting in concert with Monterey from servicing in any manner or earning any revenue from the accounts of the Legacy Clients that Monterey improperly accepted from Henderson despite knowledge of Henderson's contractual obligations;

iv.     Requiring Henderson and Monterey to immediately return to Oxford any confidential documents, data, files or information regarding Oxford's business operation or the Legacy Clients, including without limitation the categories of information listed in § 2.2 of the Employment Agreement and § 7 of the Independent Contractor Agreement, and verify under oath that all other copies of such information, which are accessible to Defendants, have been destroyed;[1] and

v.      Awarding Oxford damages including without limitation actual and exemplary damages, recovery of attorneys' fees, and such other relief as the Court deems appropriate.

Respectfully submitted,

/s/ *Scott C. Matasar*
Scott C. Matasar (0072151)
Rachel L. Hazelet (0097855)
Matasar Jacobs LLC
1111 Superior Ave., Suite 1355
Cleveland, Ohio 44114
Phone: (216) 453-8180
Fax: (216) 282-8600
smatasar@matasarjacobs.com
rhazelet@matasarjacobs.com

*Attorneys for Plaintiff Siena Capital, LLC d/b/a Oxford Financial Partners*

---

[1] With respect to the relief sought in section (iv), alternatively, Oxford requests that this Court order Defendants to submit to and pay for a forensic examination of all electronic and storage devices, including cloud-based storage locations, to enable Oxford to confirm the extent of the Confidential Information that Defendants have wrongfully acquired and/or retained, as well as to ensure the timely and complete destruction of the same.

## VERIFICATION

State of Ohio          )
                       ) SS
County of Hamilton   )

I, Erik Christman, being duly sworn according to law, hereby state that I have read the foregoing Complaint and the allegations contained therein are true and correct to the best of my knowledge and belief.

_____
Erik Christman

SWORN TO AND SUBSCRIBED in my presence this 29th day of December, 2022.

_____
NOTARY PUBLIC

Carolyn Smith
Notary Public, State of Ohio
My Commission Expires:
12/01/2027

20

### CERTIFICATE OF COMPLIANCE WITH LOC.R. 65.1

Pursuant to Loc.R. 65.1(b), I hereby certify that on December 29, 2022, the foregoing Complaint and all other filings in this action have been served upon the following via electronic mail:

Curtis L. Cornett
Cors & Bassett, LLC
201 E. Fifth Street, Suite 900
Cincinnati, Ohio 45202
clc@corsbassett.com

*Attorney for Defendant Tyler Henderson*

Monterey Wealth Partners, LLC d/b/a Monterey Wealth
c/o Jay Cohen, President
200 Ashford Center North, Suite 310
Atlanta, Georgia 30338
jay@mwria.com

/s/ *Scott C. Matasar*
*Attorney for Plaintiff Siena Capital, LLC d/b/a Oxford Financial Partners*